AO 91 (Rev. 5/85) Criminal Complaint      AUSA Robert H. Waters, Jr.      FILED by _____ D.C.

AUG 1 2 2011

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

# United States District Court

__SOUTHERN__ DISTRICT OF __FLORIDA__

UNITED STATES OF AMERICA
V.
ROBERT WILLIAM BOYD, JR.,

## CRIMINAL COMPLAINT

CASE NUMBER: 11-8324-JMH

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __June 2, 2010__ in __Palm Beach County__, in the __Southern__ District of __Florida__ defendant(s) (Track Statutory Language of Offense)

Did possess with intent to distribute 100 kilograms or more of marijuana and 1 kilogram or more of Hasish Oil,

in violation of Title __21__ United States Code, Section(s) __841(a)(1)__.

I further state that I am a(n) __Special Agent, United States Department of Homeland Security__ and that this complaint is based on the following facts:

Please see attached Affidavit.

Continued on the attached sheet and made a part hereof:   ☒ Yes   ☐ No

Signature of Complainant
David R. Malone, Special Agent
United States Department of Homeland Security

Sworn to before me and subscribed in my presence,

August 12, 2011                                    at     West Palm Beach, Florida
Date                                                      City and State

                                                          I find probable cause.

JAMES M. HOPKINS
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer                         Signature of Judicial Officer

## APPLICATION IN SUPPORT OF CRIMINAL COMPLAINT

I, David R. Malone (the "Affiant"), being duly sworn, depose and state:

1. I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations (HSI), and have been so employed for the past seven years. Prior to federal employment, I worked for the Town of Jupiter (Florida) Police Department for a period of eight and one half years, serving in the capacity of a police officer, traffic homicide investigator and police Sergeant.

2. As a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations, my duties and responsibilities include conducting criminal investigations of individuals and businesses who have violated federal laws, particularly those laws as found in Titles 8, 18, 19, and 21 of the United States Code. After being hired as a Special Agent in 2004, I received training with the United States Department of Homeland Security as to the legal principles and statutes representing criminal violations of the United States Code, as enumerated in Titles 8, 18, 19, and 21, from the Federal Law Enforcement Training Center located in Glynco, Georgia. I have obtained experience from other investigations involving the importation of narcotics through the use of marine vessels.

3. The facts set forth in this affidavit are based on my personal knowledge, information obtained in this investigation from others, including other law enforcement officers, and information gained through training and experience. Since this affidavit is being submitted for the limited purpose of establishing probable cause to support a criminal Complaint, I have not included each and every fact known to me concerning this investigation, but have set forth only those facts necessary to establish probable

1

cause to believe that Robert William BOYD Jr. has committed violations of Title 21, United States Code, Sections 841(a)(1).

4. On May 31, 2010, Special Agents assigned to the U.S. Department of Homeland Security, Homeland Security Investigations (HSI), Office of the Resident Agent in Charge, West Palm Beach (RAC/WP), Florida, received information from members of the U.S. Customs and Border Protection, Air and Marine Operations (CBP/AMO), West Palm Beach, Florida, that a Robalo motor vessel (M/V), bearing Florida registration FL9655CF was to return to the United States from the Bahamas in the early morning hours of June 1, 2010, more specifically, Curry Park Public Boat Ramp located in West Palm Beach, Florida, with drugs onboard. CBP/AMO agents advised that this information was initially received from an anonymous telephone call made to the U.S. Coast Guard, Station Lake Worth, Florida.

5. A query of the Florida Department of Highway Safety and Motor Vehicles (DHSMV) database identified FL9655CF as a 1977 23' Robalo M/V registered to Troy Allen WOLLARD (DOB 3/10/1960) of 1566 Velvet Place East, West Palm Beach, Florida.

6. On June 1, 2010, your Affiant drove by the address of 1566 Velvet Place East, West Palm Beach, Florida, and observed an empty double-axle boat trailer backed into the front yard of the residence.

7. On June 2, 2010, at approximately 1:30 p.m., the Homeland Security Investigations, West Palm Beach, received a telephone call from the U.S. Coast Guard advising that an anonymous caller reported that unknown individuals were currently hooking up the boat trailer (1566 Velvet Place East) to go and retrieve the Robalo M/V.

HSI Special Agents responded to Curry Park Boat Ramp and established surveillance. Additionally, HSI Special Agents, along with members of the Palm Beach Sheriff's Office, established surveillance in the area of the suspected residence.

8.   At approximately 3:30 p.m., Deputy Sheriff (DS) Louis Lamm III observed a Ford pickup, red in color, with a boat (FL9655CF) in tow, traveling south on Drexel Road from Okeechobee Blvd with a red/maroon car following behind.  DS Lamm observed the boat trailer had no visible tag, nor did it have tail lamps.  DS Lamm, operating an unmarked law enforcement vehicle, activated his emergency lights and siren in the attempt to initiate a traffic stop on the truck with boat in tow as the vehicle turned east onto Velvet Place.  The operator of the red truck (later identified as George P. CONDRON Jr.) stopped the vehicle in front of 1566 Velvet Place East.  DS Lamm ordered the occupants to stay in the vehicle, and summoned the assistance of DS Anthony Combs and DS Tim Tessitore (K-9 Edo).  After securing the scene, DS Tessitore deployed K-9 Edo, a trained narcotics detection canine, and a systematic and thorough sniff of the exterior of the truck and vessel was conducted.  K-9 Edo gave a positive alert for the presence of a narcotic odor at or near the front bow of the vessel. DS Tessitore entered the vessel, and proceeded to the front cabin.  As he opened the cabin door, he was overwhelmed with the odor of raw marijuana.  DS Tessitore observed several large white burlap bags containing large amounts of suspected marijuana.

9.   Upon further search of the vessel, approximately 395 pounds of marijuana (field tested positive), and 110 pounds of hashish oil (field tested positive), was discovered and seized from the cabin located at the bow of the vessel.  Furthermore, a

3

black colored wallet containing the Florida Identification Card for Robert William BOYD Jr. (DOB 1/8/1968), a marine chart, and a Lighthouse Point Marina Sunoco receipt was discovered on the vessel.

10. On this same date, June 2, 2010, at approximately 4:15 p.m., your Affiant, along with HSI Special Agent Joshua Woodbury interviewed Michael A. Lester on the sidewalk located next to 1566 Velvet Place East, West Palm Beach, Florida. Mr. Lester essentially stated the following:

   A. On May 31, 2010, between approximately 1:00 p.m. and 2:00 p.m., Troy WOLLARD and an unknown white male asked Lester for assistance in launching WOLLARD's boat as he did not have a vehicle to tow it to the boat ramp. Lester agreed, and the boat trailer (with boat) was attached to Lester's Ford pickup truck. Lester advised that the boat trailer did not have a valid Florida tag, so another tag (unassigned) was affixed to the rear. Lester, WOLLARD, and the unknown male departed the residence located at 1566 Velvet Place East.

   B. Lester advised that while enroute to the boat ramp, they stopped off at West Marine, located on Okeechobee Blvd. near I-95, where WOLLARD purchased a marine chart. After departing West Marine, Lester listened in on the conversation between WOLLARD and the unknown white male. Lester stated he heard WOLLARD and the unknown male talking about traveling to Bimini, Bahamas, to pick-up the "stuff".

   C. At approximately 2:30 p.m., Lester launched the boat at Curry Park Boat Ramp with WOLLARD and the unknown white male onboard. Lester returned to WOLLARD's residence and parked the trailer in front of the house.

D.   Your Affiant asked Lester if the vessel stopped by law enforcement was the same vessel he launched on May 31, 2010.  Lester answered in the affirmative.

11.   On June 2, 2010, at approximately 5:36 p.m., your Affiant read George CONDRON his Miranda Rights via a pre-printed form.  CONDRON stated he understood his rights; read and initialed each line; waived his rights and elected to speak with the interviewing agents.  CONDRON essentially stated the following.

A.   On June 2, 2010, at some point in the afternoon, CONDRON had gone to his bank.  He received a telephone call from Jesse MOREE, asking to meet CONDRON at his house located off Blue Heron Blvd.  Jesse arrived at CONDRON's house, and asked for help in pulling a boat out of the water.  CONDRON agreed to help, as he owns a truck with a trailer hitch.

B.   CONDRON and MOREE drove in CONDRON's truck over to a residence located off Drexel Road.  Upon pulling up to the front of the house, CONDRON observed a boat trailer sitting in the front yard.  After exiting the truck, he and MOREE were met by Troy WOLLARD and Bob (LNU).  The boat trailer was connected to CONDRON's truck, and he and Bob followed WOLLARD and MOREE in a red car to the Lake Park Boat Ramp.

C.   Once at the Lake Park Boat Ramp, Bob entered the red car with WOLLARD and MOREE.  After a short period of time, Bob returned alone to the boat ramp in the red car.  An additional one half hour went by, when CONDRON observed WOLLARD and MOREE on the boat in the Intracoastal Waterway,

motoring towards the ramp. Bob backed the truck and trailer down the ramp and loaded the boat. The vessel was removed from the water.

D.     CONDRON then entered his truck as the operator, with MOREE as the passenger. They proceeded towards the residence off Velvet, with WOLLARD and Bob following in the red car.

12.    On June 4, 2010, HSI Special Agents responded to the West Marine store located at 1900 Okeechobee Boulevard, West Palm Beach, Florida, to ascertain if a "Waterproof chart #38B Bahamas Crossing, Bimini and West End" was sold on May 31, 2010. Mr. Robin Stellwagen, store manager, queried the store's database and retrieved a record/receipt that showed only one #38B marine chart was sold on May 31, 2010 by store sales associate John Gove.

13.    On June 7, 2010, HSI Special Agents interviewed John Gove at the West Marine store at the address listed in paragraph 12. Gove essentially stated the following:

A.     On May 31, 2010, two white male subjects came into the store and requested a map that showed how to cross from Florida to Bimini, Bahamas. Gove escorted the subjects to the map area and pulled out the "Waterproof Chart #38B." Gove stated the subjects asked some unusual questions and thought it was kind of suspicious. Gove said the subjects wanted to know what direction to steer from West Palm Beach to Bimini, how much fuel would it take, and how long would it take to get there. Gove advised the subjects that they would be better off taking the boat further south to Hillsboro Inlet and filling-up with fuel before heading to Bimini.

14. On June 7, 2010, your Affiant interviewed Gerald Listokin (dock attendant) inside the dock store of Lighthouse Point Marina. Listokin advised that he assisted in the fueling of the 20' Cuddy Cabin vessel on May 31, 2010. Listokin essentially stated the following.

   A. Listokin recalled that on May 31, 2010, sometime in the late afternoon, he assisted in the fueling of a 20' Cuddy Cabin vessel with two white males onboard.

   B. Listokin stated that the captain of the vessel asked him for directions to the Bahamas. Listokin told the captain to travel at a 130 degree heading, and you will hit the Bahamas. Listokin was surprised that the captain would attempt to make this venture, as the vessel had a single outboard motor, and appeared to be in poor condition. Listokin stated that the occupants purchased fuel and oil, and wanted to purchase some cigars, but did not have enough money, so they bought a bag of chips.

   C. Listokin stated that before departing the fuel dock, one of the occupants asked him if he wanted to join them on the trip. Listokin commented that he would like to, but his probation officer would probably be in the sky. One of the occupants responded, "Yeah, ours too."

15. On March 24, 2011, a Federal Grand Jury, Southern District of Florida, returned a "True Bill" on a two count Indictment, charging Troy Allen WOLLARD and Jesse John MOREE with violations of Title 21, United States Code, Section 841(a)(1), Possession With the Intent to Distribute 100 kilograms or more of Marijuana (Count 1), and 1 kilogram or more of Hashish oil (Count 2).

16. On April 8, 2011, HSI Special Agents arrested WOLLARD and MOREE, and both were placed in Federal Criminal proceedings.

17. On April 27, 2011, a proffer was obtained from Troy WOLLARD at the Homeland Security Office, located at 501 South Flagler Drive, Suite 500, West Palm Beach, Florida. WOLLARD essentially stated the following as it relates to the probable cause sought in this affidavit.

    A. WOLLARD has never been to Bimini, Bahamas, but Robert BOYD has, and WOLLARD believed BOYD knew how to get there.

    B. WOLLARD stated that BOYD knew that he and WOLLARD were going to Bimini to pick-up a load of marijuana, and WOLLARD promised BOYD a percentage of his (WOLLARD) payment for his (BOYD) help.

    C. On May 31, 2010, WOLLARD, BOYD, and Mike Lester hooked the boat and trailer to Lester's truck. They fueled the boat with gas, and purchased ice and water. On the way to the boat ramp, they stopped by West Marine and purchased a marine chart. After leaving West Marine, they proceeded to Curry Park and launched the boat.

    D. WOLLARD and BOYD departed the boat ramp and exited the Intracoastal Waterway via the Lake Worth Inlet. They motored south along the coast to the Hillsboro Inlet. They entered the Inlet and stopped at the Lighthouse Point Marina for fuel, oil, and a bag of chips. WOLLARD asked the dock attendant for a compass heading for Bimini, Bahamas. WOLLARD was advised to steer 100 degrees until he sees land.

E. Upon leaving Lighthouse Point Marina, WOLLARD and BOYD exited the Intracoastal Waterway via the Hillsboro Inlet on a 100 degree heading, towards what they believed to be Bimini, Bahamas. WOLLARD was at the helm until he became tired, and then BOYD drove. It started to get dark, when WOLLARD and BOYD asked a passing freighter for a compass heading to Bimini. Unknown person(s) directed WOLLARD and BOYD to steer 140 degrees. Soon after leaving the freighter, a Blackhawk helicopter flew over WOLLARD's vessel. WOLLARD waved his arm in the attempt to communicate with the personnel onboard the helicopter that he and BOYD where heading in the direction of Bimini.

F. Approximately 45 minutes after dark, WOLLARD observed the lights of Bimini. He and BOYD entered the harbor and tied-up to the dock. WOLLARD slept in the chair at the helm, while BOYD slept in the cabin. At no time did WOLLARD or BOYD clear Bahamian Customs.

G. On or about the morning of June 1, 2010, an unknown young female walked-up to the boat and asked WOLLARD if he was Troy. She then asked WOLLARD to follow her over to a room where he then met an unknown, large, black male. The large male asked WOLLARD where his partner (BOYD) was, and then pointed to a room where WOLLARD and BOYD were to stay until the large male came back to get them. WOLLARD was given $40 USD to buy food. WOLLARD and BOYD left the room to go eat fish. Upon the completion of eating, WOLLARD and BOYD returned to the room to wait.

H.     On June 2, 2010, at approximately 5:00 AM, WOLLARD and BOYD departed the room and traveled to the prearranged location and tied off to the sport fish vessel.  After waiting approximately 35 minutes, two unknown individuals, one wearing a bandana, arrived and instructed WOLLARD to pull up to the next dock.  After a short period of time, a van pulled up to their location, and the two individuals started tossing white, burlap, heavy bags over the wall to WOLLARD.  WOLLARD then tossed the bags to BOYD who was securing the bags in the cabin of the vessel.  WOLLARD recognized that 5 or 6 of the bags were different than the others as they were lighter.  WOLLARD stated all the bags emitted a very strong odor of marijuana.

I.     After WOLLARD and BOYD finished loading the bags on the vessel, BOYD realized he left his cell phone in the room.  WOLLARD and BOYD returned to the room to retrieve the phone, and then departed Bimini for Hillsboro Inlet.  After a short distance from the shore of Bimini, the vessel stalled, causing WOLLARD and BOYD to squeeze the fuel bulb all the way back to Hillsboro Inlet to keep the motor running.  They entered Hillsboro Inlet and arrived at Lighthouse Point Marina to put $50 USD of fuel in the boat.  WOLLARD and BOYD exit the Hillsboro Inlet and motor north along the coast to the Lake Worth Inlet.

J.     WOLLARD and BOYD entered the Lake Worth Inlet, and tied-up the vessel near the old Pizza Hut on the Earman River in North Palm Beach, FL.  BOYD's cell phone was completely dead, but somehow he contacted one of his friends to come pick him and WOLLARD up and drive them to MOREE's house.

Once arriving at MOREE's, WOLLARD called Lester to see if they could borrow his truck again to pull the vessel from the water. Lester told WOLLARD that his truck was currently broke down and could not help. MOREE then called George Condron, and told him that they need to borrow his red truck because the boat was sinking.

K.  WOLLARD, BOYD, and MOREE drove to Condron's house to get the truck, and then drove to WOLLARD's house to hook-up the boat trailer. WOLLARD grabs his girlfriend's (Sherri) car and he and BOYD drive to the Lake Park Marina with Condron and MOREE following in the truck and trailer.

L.  Upon arriving at the marina, MOREE jumped in the car with WOLLARD and BOYD, leaving Condron at the boat ramp. WOLLARD, BOYD, and MOREE travel to where WOLLARD's boat was tied-up, when WOLLARD and MOREE get out and enter the vessel to move it to the marina. Upon stepping on the vessel, MOREE looked into the cabin at all the marijuana. WOLLARD and MOREE depart the dock and motor towards the Lake Park Marina.

M.  Upon arrival at the boat ramp, MOREE insists on driving the vessel onto the trailer, and was in a hurry to do so. WOLLARD pulled the plug and removed his belongings from the boat. All four subjects depart the marina, WOLLARD and BOYD in Sherri's car, and Condron and MOREE in the truck with boat in tow.

N.  As WOLLARD and BOYD get close to WOLLARD's house, BOYD jumped out of the front right passenger seat and went around the corner to purchase some drugs as he has a problem.

O.  Soon after turning onto Drexel Road, the police SUV activated his emergency lights and sirens to initiate a traffic stop, when WOLLARD motioned for the police to go around him. WOLLARD sped away and went around the corner to purchase some beer. BOYD then walked up to WOLLARD when WOLLARD told him what happened. WOLLARD and BOYD did not know what to do, and were scared.

P.  Subsequent to the seizure, BOYD received numerous telephone calls on his cell phone, one from the same guy in the Bahamas, and several from unknown individuals with a "954" area code. WOLLARD and BOYD were being accused of ripping off the load, and they could not get ahold of MOREE. WOLLARD believed MOREE was in jail, as Sherri told him that MOREE's sister came by the house and picked-up MOREE's car.

18.  Your affiant submits that there is probable cause to believe that Robert William BOYD Jr. did knowingly and intentionally possess with intent to distribute a controlled substance, that is Marijuana and Hashish Oil, in violation of Title 21, United

States Code, Section 841(a)(1).

FURTHER YOUR AFFIANT SAYETH NAUGHT.

_____
DAVID R. MALONE, SPECIAL AGENT
HOMELAND SECURITY INVESTIGATIONS

Sworn to and subscribed before
me this _12_ day of August, 2011

_____
JAMES M. HOPKINS
UNITED STATES MAGISTRATE JUDGE